### In the Matter of M&M TRANSPORTATION COMPANY, Debtor.

79 Civ. 5968 (HFW). 77 B 122.

United States District Court,
S. D. New York.

April 16, 1980.

See also, D.C., 437 F.Supp. 821.

Bower & Gardner, New York City, for appellant Swartz; Gerald N. Swartz, New York City, of counsel.

Robert E. Holland, Boston, Mass., for appellants other than Swartz.

Finley, Kumble, Wagner, Heine & Underberg, New York City, for appellee; Fredric

E. Weinberg, Seth Zachary, Paul L. Bindler, New York City, of counsel.

## OPINION

HENRY F. WERKER, District Judge.

This is an appeal from an opinion and order of the Honorable Roy Babitt, Bankruptcy Judge, which (1) denied the motions of the 21 claimant-appellants[1] for an order setting aside a prior order confirming a Chapter XI arrangement, and (2) granted the debtor-appellee's motion for summary judgment expunging and disallowing the claims of the claimant-appellants. The debtor-appellee is M&M Transportation Company ("M&M"), and the claimant-appellants are former employees of M&M who participated in an M&M pension plan for non-union employees.

## FACTS

On December 1, 1955, M&M established a pension plan (the "Plan") for its administrative employees. The Plan, as amended through 1971, provided that an employee was entitled to pension benefits when he retired from M&M upon reaching the age of 65 if he had worked for M&M for at least ten years. After the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, was enacted, the Plan was amended on September 29, 1975 (the "Amended Plan") to provide for termination insurance and more liberalized vesting. Under the Amended Plan, an employee was entitled to receive pension benefits at age 65 if he had retired from M&M upon reaching the age of 55 and had worked for M&M for at least ten years.

On January 19, 1977, M&M filed its Chapter XI petition under the Bankruptcy Act of 1898, 11 U.S.C. § 701 *et seq.*[2] It there-

---

1. The claimant-appellants are:
   Ewart Bairstow, George J. Borgos, Jr., John J. Breen, Melvin Fallman, Frederick W. Graichen, Dorothy M. Leavitt, Mary E. Maltas, Eileen J. Mansfield, John Medairos, Margaret Moran, Eileen B. Peters, James Riseberg, Gerald A. Schilling, Kenneth J. Smith, Philip J. Spinelli, Edward A. Sprague, Jr., Ernest M. Steward, Lucy Valenzano Caporale, Joseph

   A. Ventura, Sol Yourman, and Bernard A. Swartz.

2. Pursuant to section 403(a) of Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2549, 2682, this bankruptcy proceeding is to be governed by the provisions of the 1898 Bankruptcy Act, since that Act was still in effect when this proceeding was commenced.

after terminated substantially all of its operations. The appellants were discharged from their employment, and the Amended Plan was terminated. In June of 1978, M&M entered into an agreement with the Pension Benefit Guaranty Corporation (the "PBGC"), and the latter was substituted as trustee of the Amended Plan to enable it to administer the payment of guaranteed pension benefits. In accordance with section 4022 of ERISA, 29 U.S.C. § 1322, the PBGC advised the appellants, with the exception of Swartz, that only 20 per cent of their anticipated benefits were guaranteed. The PBGC refused to guarantee any part of Swartz's anticipated benefits on the ground that he had not reached age 55 when the Amended Plan was terminated. The PBGC filed a claim with the Bankruptcy Court pursuant to ERISA § 4062, 29 U.S.C. § 1362, for $110,000, which amount represented a $75,000 deficiency in assets in the pension fund to cover guaranteed benefits and some $35,000 to cover actuarial fees charged by M&M's private actuarial firm. M&M did not object to the PBGC's claim, but contended that the claim represented the full extent of its liability to the appellants.

An arrangement plan was confirmed by the Bankruptcy Court in November 1978. Thereafter, the appellants filed proofs of claim for the unguaranteed portion of their anticipated pension benefits. Although their claims were untimely, the appellants argued that M&M misled them into believing that they would be receiving all of their anticipated benefits, and sought to set aside the confirmation order pursuant to section 386 of the 1898 Act, 11 U.S.C. § 786. The appellants alleged that M&M had $12,000,000 in assets and only $6,000,000 in liabilities, and that M&M had substantially underfunded the Amended Plan in violation of its provisions and Title I of ERISA. M&M moved for summary judgment expunging the claims.

Judge Babitt granted M&M's motion and denied the appellants' application, ruling that M&M had fulfilled all of its obligations by consenting to the payment of the PBGC's claim for $110,000. Judge Babitt held, in effect, that an employer is beyond the reach of claims arising from its terminated pension plan except to the extent of its liability to the PBGC under section 4062 of ERISA, 29 U.S.C. § 1362. Judge Babitt consequently ruled that the appellants were not "creditors" within the meaning of the Bankruptcy Act and granted summary judgment against them without reaching their claims of fraud under section 386.

The appellants filed the instant appeal, arguing that they are creditors of M&M who should have been included in the plan confirmed by Judge Babitt. They contend further that M&M prevented them from filing their proofs of claim by fraud and fraudulent concealment, alleging that M&M underfunded the pension plan and, knowing that the plan was underfunded, assured them that they would receive all their anticipated benefits. In his briefs, appellant Swartz maintains that M&M's liability to its employees with vested rights cannot be limited by section 4062 of ERISA, 29 U.S.C. § 1362. He contends that section 4062 deals only with an employer's liability to the PBGC, and that M&M is liable to the claimants under other statutory and contractual obligations, since ERISA could not have been intended to absolve an employer of its obligations to pension plan participants.

## DISCUSSION

This case presents another question of first impression under ERISA: whether an employer may be liable to his former employees for benefits due under a terminated pension plan when the employer has fulfilled his obligations to the PBGC under section 4062 of ERISA, 29 U.S.C. § 1362.

Title IV of ERISA, 29 U.S.C. § 1301 *et seq.*, established a federal system of termination insurance for covered pension plans. *See* ERISA § 4021, 29 U.S.C. § 1321. The PBGC was created by Congress to administer this program. *Id.* § 4002, 29 U.S.C. § 1302. Pursuant to section 4022, 29 U.S.C. § 1322, the PBGC guarantees the payment of certain "nonforfeitable" benefits to employees participating in a covered plan upon

the plan's termination. Under this scheme, if there are insufficient funds in a covered plan to pay all benefits guaranteed by the PBGC, the benefits will be paid by the PBGC. To finance these payments, the PBGC collects insurance premiums from employers who maintain covered plans. *Id.* §§ 4006–07, 29 U.S.C. §§ 1306–07. In cases where pension plans are underfunded and the PBGC must pay guaranteed benefits, the employer is required to reimburse the PBGC for benefits paid in excess of fund assets up to 30 per cent of the employer's net worth. *Id.* § 4062(b), 29 U.S.C. § 1362(b). *See generally Nachman Corp. v. PBGC*, 592 F.2d 947, 951 (7th Cir.), *cert. denied*, 442 U.S. 940, 99 S.Ct. 2881, 61 L.Ed.2d 309 (1979).

The PBGC does not guarantee all nonforfeitable benefits of all covered plans. Benefits due under plans which have been in effect for less than five years when they are terminated, or which have been amended within five years prior to termination to provide for increased benefits, are guaranteed only to the extent of (1) the greater of $20.00 per month or 20 per cent of the amount which would have been guaranteed had the plan or amendment been in effect for five or more years, (2) multiplied by the number of years the plan or amendment has been in effect. ERISA §§ 4022(b)(1), (8), 29 U.S.C. §§ 1322(b)(1), (8).

In the instant case, the Amended Plan had been in effect for only one year when it was terminated. *See* ERISA § 4022(b)(8), 29 U.S.C. § 1322(b)(8). Consequently, the PBGC determined that it could guarantee only 20 per cent of the appellants' anticipated benefits, with the exception of Swartz. After M&M filed its Chapter XI petition, the PBGC put in a claim for $110,000, $75,000 of which represented the amount of guaranteed benefits exceeding the assets in the pension fund. M&M did not object to the PBGC's claim. It is undisputed that as a result of these circumstances M&M met all of its obligations to the PBGC. The only question is whether by doing so M&M necessarily met all of its obligations to its former employees. I think not.

The appellants have alleged that M&M has not in fact met all of its obligations to them under either the applicable provisions of the Plan and Amended Plan or Title I of ERISA. They quote paragraph 8.1 of the Plan, which provides:

> From time to time the employer *shall* make such contributions to the fund as it determines are required to maintain the Plan on a *sound actuarial basis.*

(Emphasis added). Appellant Swartz also relies on a corporate resolution passed in May 1977 which retroactively amended the Plan to provide that:

> [T]he Plan shall be funded on an *actuarially sound basis*, in that in no event shall the funding be less than that which is required by the minimum funding standards of ERISA.

(Emphasis added). Although M&M points to other provisions which would appear to be inconsistent with those quoted above, see appellee's brief, at 16, any inconsistencies must at this juncture be read in the appellants' favor, since this matter was disposed of by summary judgment.

▉ The provisions of the Plan and the Amended Plan are to be followed as long as they are not inconsistent with ERISA. *See Blackmar v. Lichtenstein*, 603 F.2d 1306, 1309 (8th Cir. 1979) (legislative history of ERISA demonstrates that provisions of employee profit sharing trust instrument are to be followed unless they conflict with the requirements of ERISA). It has been held that the creation of a pension plan constitutes an offer of a unilateral contract by an employer to his employees. By performing the conditions of the offer, the employees accept the offer and a unilateral contract is thereby created. *See Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 4–5 (1st Cir. 1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); *Denzer v. Purofied Down Products Corp.*, 474 F.Supp. 773, 776 (S.D.N.Y.1979); *Hardy v. H. K. Porter Co.*, 417 F.Supp. 1175, 1183 (E.D.Pa.1976). M&M's reliance on the preemption provision of ERISA, ERISA § 514(a), 29 U.S.C. § 1144(a), to the effect that "contractual theories emanating from state law doc-

trines are clearly superseded by . . . ERISA," appellee's brief, at 10, is misplaced. As one district court has observed, "Congress did not intend to render prior law irrelevant where it fairly accommodates the interests of the parties and is not inconsistent with ERISA's purposes." *Shaw v. Kruidenier*, 470 F.Supp. 1375, 1382 (S.D.Ia.1979). For the purposes of this appeal of the Bankruptcy Court's granting of M&M's summary judgment motion, I hold that M&M has not met all of its obligations to the appellants under the Plan and Amended Plan and Title I of ERISA.

Section 4062(b) of ERISA, 29 U.S.C. § 1362(b), provides in pertinent part that "[a]ny employer to which this section applies shall be liable to the [PBGC] . . . ." Neither section 4062 nor any other provision of ERISA, however, addresses the issue of whether an employer fulfills his obligations to his employees when he fulfills his obligations to the PBGC. To arrive at a solution to this problem, the legislative intent must be ascertained.

In enacting ERISA, Congress established a comprehensive scheme for the protection of employee benefit plan participants and their employees. *See* ERISA § 2, 29 U.S.C. § 1001. ERISA was designed to correct "various deficiencies existing in the private pension plan systems . . . ." S.Rep. No. 93–127, 93d Cong., 1st Sess. 1, *reprinted in 1 Legislative History of the Employee Retirement Income Security Act of 1974* 587 (1976) (hereinafter cited as *Legislative History*), U.S.Code Cong. & Admin.News 1974, pp. 4639, 4838. One such deficiency was the loss of vested pension benefits caused by the termination of underfunded plans:

> Our private pension plans have served the needs of many workers very well. But the system is subject to one very simple defect. Too many people pay money into private pension plans year after year expecting eventually to receive retirement income, and they end up getting nothing. And that . . . is what this bill is all about. It is unfair and inequitable, and almost invariably, tragic as well, for

workers to defer income from wages or salary in anticipation of retirement benefits which they will never get.

. . . . .

> Unexpected financial or other difficulties, embezzlement, mismanagement, and simple honest mistakes can lead to premature termination of underfunded plans. Termination insurance will provide a backup for the funding requirements and safeguard workers who might otherwise be deprived of benefits or other retirement credit.

Remarks of Rep. Perkins, *reprinted in 2 Legislative History* 3367, 3371. Title IV was thus enacted and a termination insurance program implemented to insure that employee pension plan participants and their beneficiaries would not be deprived of anticipated benefits. *See United Steelworkers v. Crane Co.*, 605 F.2d 714, 717 (3d Cir. 1979); *Nedrow v. MacFarlane & Hays Co.*, 476 F.Supp. 934, 935 (E.D.Mich.1979).

To insure that the termination program would not be abused by employers intentionally terminating underfunded plans to take advantage of insurance coverage, Congress decided to impose a limited liability on solvent employers to reimburse the PBGC for guaranteed benefits in excess of fund assets. *See* S.Rep. No. 93–383, 93d Cong., 1st Sess. 87, U.S.Code Cong. & Admin.News 1974, p. 4639, *reprinted in 1 Legislative History* 1063, 1155; Analysis of Amendment No. 496 to S. 4, *reprinted in 2 Legislative History* 1723–24. This decision ultimately resulted in the passage of section 4062(b), which, as noted above, limits liability to 30 per cent of an employer's net worth. The five-year phase-in provision was also intended to prevent abuses by employers. Congress provided that plans or amendments in effect for less than five years at termination would not be fully guaranteed because "otherwise there might be a temptation to increase benefits irresponsibly." S.Rep. No. 93–383, 93d Cong., 1st Sess. 82–83, *reprinted in 1 Legislative History* 1628; Analysis of Amendment No.

496 to S. 4, *reprinted in* 2 *Legislative History* 1723.

Employer liability was limited to 30 per cent of net worth because of Congress' concerns for the financial well-being of employers. In fact, a scheme providing for complete reimbursement was considered but rejected for fear of substantial economic hardship being imposed on employers. *See* S.Rep. No. 93–127, 93d Cong., 1st Sess. 26, *reprinted in* 1 *Legislative History* 587, 612. These concerns were based in part on Congress' desire to continue to encourage the voluntary establishment of private pension plans. *See* ERISA § 4002(a)(1), 29 U.S.C. § 1302(a)(1); H.R.Rep. No. 93–807, 93d Cong., 2d Sess. 8–9, U.S.Code Cong. & Admin.News 1974, p. 4639, *reprinted in* 2 *Legislative History* 3115, 3128–29.

In light of this congressional expression of concern for the financial well-being of employers, M&M's argument that Congress did not intend employers to be liable beyond their liability to the PBGC is admittedly a strong one. Given the entire thrust of ERISA, however, I cannot conclude that Congress intended section 4062 to cut off an employee's vested pension benefits, particularly under the circumstances of this case.

■ ERISA is a remedial statute. As such, it is to be construed liberally "in order to carry out its purposes of protecting the interests of [employee benefit plan] participants and beneficiaries." *Marshall v. Kelly*, 465 F.Supp. 341, 349 (W.D.Okl.1978). The appellants alleged in the Bankruptcy Court that M&M had net assets of $6,000,000 and that it had substantially underfunded the Amended Plan. Since these allegations were raised by the parties opposing summary judgment, they must be taken as being true. The situation alleged by the appellants is thus one where an employer, with some $6,000,000 in net assets, who has substantially underfunded his employees' pension plan, seeks to avoid his obligations to his employees by shielding himself behind section 4062 of ERISA. Congress could not

have intended section 4062 to be used in this fashion.

This conclusion is not inconsistent with either the language of section 4062 or the portions of the legislative history relied on by M&M. The statute speaks only in terms of employer liability to the PBGC; it certainly does not provide that an employer is absolved of his obligations to his employees once he meets his obligations to the PBGC. It should also be noted that section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), which is part of Title I, provides that "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due him under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan." There is nothing in ERISA that would indicate that this right to bring a civil action is cut off by the operation of section 4062.

The legislative history of ERISA expressing Congress' reluctance to impose extreme financial burdens on employers also indicates that this reluctance stemmed at least in part from Congress' desire to encourage voluntary pension plans. This desire, of course, flows directly from Congress' principle goal in enacting ERISA: protecting employee benefit plan participants and their beneficiaries. Similarly, the legislative history indicates that the reimbursement and phase-in provisions of Title IV were passed to prevent employer abuses and to protect PBGC assets, again, for the ultimate purpose of protecting pension plan participants and their beneficiaries. To permit employers to use these portions of the legislative history to cut off the rights of their employees would be to contravene the essential purpose of ERISA.

Had Congress considered the question now before the Court, it undoubtedly would have concluded that Title IV of ERISA cannot be used to preclude employees from seeking anticipated pension benefits from an employer who has fulfilled his limited obligations to the PBGC.

## CONCLUSION

In accordance with the above, I hold that an employer may be liable to his former employees for benefits due under a terminated pension plan even when the employer has met his obligations to the PBGC under section 4062 of ERISA. The opinion and order of the Bankruptcy Court granting summary judgment in M&M's favor are hereby reversed, and the action is remanded for consideration of the appellants' section 386 claims and resolution of other factual and legal issues.[3]

SO ORDERED.

---

**3.** This opinion is not to be construed as a holding that the appellants are entitled to be awarded their claims. There are material questions of fact and issues of law that must be resolved before a decision on the merits can be reached.

I hold only that the appellants are not precluded by section 4062 from seeking to obtain from M&M pension benefits to which they may be entitled.